[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MORANDUM OF DECISION
This matter is the second remand following an appeal with respect to the payment of child support. CT Page 9659
The respondent called Marva Downes, the Director of Youth Challenge for Women, a community outreach program for individuals with substance abuse problems. She has been in the position for eleven (11) years, and has a degree in Biblical studies and Business. She met the respondent in 1989, during a telephone call from Puerto Rico, where respondent had been in a program. Respondent had worked with counsel to secure visitation with her children, who were living with the petitioner in the Hartford area. The respondent needed to become involved in a program, and was accepted into Youth Challenge. The witness picked her up from the airport, and has been part of the respondent's support system since that time.
Respondent stayed in the program, was counseled for her problems, which included issues surrounding the children. She left the residential program in May of 1991 when she was able to work outside the program, but retained her contacts with the witness, as a support system, for counseling, guidance, strength, and moral support. The respondent returned to the residential program from November of 1995 to June of 1997. She was emotionally unstable during that time. The witness described respondent's commitment to sobriety as strong. On cross-examination, she agreed that the program was essentially spiritual, and was accessed by clients after the failure of more traditional psychological interventions. Respondent had been in a program in Puerto Rico called "Horgar Postada Lavatoria" which was also residential. The respondent agreed to stay at Youth Challenge for a minimum of eighteen months, with supervised recreation or other activities. Between May of 1991 and November of 1995, she secured an apartment after she became employed at the Aetna. The witness described the habits of respondent's visits with the children during her residential placement at Youth Challenge.
Ms. Downes testified that she thought the visits started in 1990, when Janet came and tap danced for her mother. She also drove the respondent to petitioner's house one other time in 1990 for a visit. She did not recall the timing of all visits, although she recalled other ministry members assisting in the visitation process. After the residential period, the witness saw the respondent at weekly religious services at Glory Chapel, and at other times. Prior to the second residential placement, the respondent had relapsed on crack cocaine, and was needing inpatient treatment.
During the first half of 1997, respondent was not working. She received a stipend of approximately Twenty-five ($25.00) Dollars per week.
Respondent called Paul Echtenkamp, who is with Youth Challenge. He described the organization as non-profit with residential and outreach CT Page 9660 programs for individuals with alcohol and drug problems. He has a Bachelor's Degree from Amherst College, with a major in English, and a Master's Degree in Education-Biblical Studies. He directs the men's group program at Youth Challenge, but has counseled the respondent during her stay in the women's program. He claimed that she benefitted from the holistic approach of the Youth Challenge to her issues. She is currently a receptionist and clerical person for the Youth Challenge. The witness claimed that it was a supportive work environment, and not consistent with a real world work environment.
On cross-examination, the witness testified that respondent works a little over twenty hours per week, increasing from ten hours. She has been phased in slowly from her involvement with the mission for women. After the luncheon recess, respondent's compensation records from November 21, 1996 to March 13, 1998 were produced. All income for calendar year 1996 was part of the stipulation of the parties. In January of 1997, she was receiving a stipend of $25.00 per week. On July 9, 1997, that amount was increased to $50.00, and on October 30, 1997, she attained her current wage of $115.00. At Christmas, he understood that she worked part-time at Filene's. From July 9 until October 30 she had been living with her daughter and then on her own on May Street, where the Youth Challenge is located. She may also have been on public assistance, but he is unsure of that. The ministry did make a contribution toward her housing expenses.
The respondent called Noemi Maldonado, her adult child. She is nineteen and resides with her father in New Haven. She is a teacher's aide at a nursery school, and has been admitted to UConn in September. She hopes to study elementary education. She was called to testify concerning visits with her mother, which she recalled were about weekly from 1991 until late 1994. She usually had someone from the church help with visits. During those visits, they stayed in the apartment and played games, or went to a park. They attended events such as the Taste of Hartford, or the "Y", where events were free. During visits, they had birthday parties, and celebrated Christmas, and would go out shopping here and there. In February of 1995, she moved out of the petitioner's home and moved in with the respondent. She lived there for five months, then moved to her sister's home in Ohio. When she moved back to Connecticut, permanently, she has seen her mother approximately twice per month.
On cross-examination, respondent's daughter agreed that transportation was done by one of her mother's friends from the church, and she never saw the exchange of money for that transportation. She did not know whether or not her mother was expected to pay for that service.
The respondent testified. She has a rental expense of Three Hundred, CT Page 9661 Fifty ($350.00) Dollars per month, and it is not Section 8 housing. She did get some public assistance during the time she received the Fifty ($50.00) Dollars per week stipend. Her work was described consistently with prior testimony.
She claimed a deviation from the Child Support Guidelines. She fought for time with her children, and against an action to terminate her parental rights. There was protracted litigation concerning visits. There was visitation at the Favrow's home, which the respondent described as stressful. In May of 1990, visits were suspended, occasioned by a suicidal gesture of the oldest child. After that suspension, visits resumed in September 1990. She claimed that she went to court frequently to assure that visits would occur. In May of 1991, when she had her own apartment, she saw the children for a period of hours, increasing in number over the years until 1994. She testified that they were not allowed by the court to have overnight visits with their mother. She claims that she had expenses when the children were taken to an amusement park, up to Fifty ($50.00) Dollars. She agreed during cross-examination that the cost of one of the trips was paid for the father of her youngest child, who also transported them. The defendant paid for the public pool (minimal) and games. She claimed that she would pay $3.00 to $5.00 for gas to those church members who assisted her by driving her to visitation.
Upon inquiry by the Assistant Attorney General on behalf of the claim of the State of Connecticut, she agreed that she has not seen the youngest child for one year. The child continues to reside with the petitioner. The respondent agreed that she provided food the one day per week that she saw the children, or on other days as the visits expanded, but that the food was on hand in her home.
With respect to rents, the respondent paid between $535.00 and $450.00 per month between 1991 and 1994, during the time she worked at the Aetna. (See Respondent's Exhibit 16) She worked at the store there, making $6.00 to $7.00 per hour. During that time she used the bus to see the children. In late 1994, she worked at Hartford Primary Care where she had to buy a bus pass for $36.00 per month. She had laundry expenses of approximately $10.00 per week.
She continues to feel the need for the protective support of the ministry and her faith to maintain her sobriety. She feels a part of the church family community, and has help in dealing with all the stresses of her life. She does not believe that she would function as well in society. There are still times when she would like to escape her reality in a drink. She claims that she has no interest in drugs. She wants to complete her college degree, and has an interest in Bible studies, and CT Page 9662 the law.
On cross-examination by petitioner's counsel, the respondent claimed that she moved from the Youth Challenge to provide a home for Sarai, after the child left her DCF placement. She testified that she might very well have stayed in residence at the Youth Challenge if that had not been the case. The respondent claimed that the petitioner had "thrown Sarai out." The child was in foster care, or in a placement during this period, and not in residence with her mother. She could not testify that she spent any more money on visitation than the expenses which were normal for her.
She claimed that she was in court twenty times, and she was asked to produce those. The court required the parties to produce a summary of those dates. That stipulation was received, containing five (5) pages of summary of Juvenile Matters proceedings, which the court ordered to be sealed, a one (1) page summary of Probate Court action, and an Amended Defendant's Memorandum, filed after the first day of evidence.
The respondent was asked if the referrals that she made exacerbated the visitation conflict, and she claimed that the petitioner had abused her children, emotionally, physically, and sexually during their care of them. She claimed that the attorney was also a part of the conspiracy to discredit her, especially in taking advantage of her addiction. She claimed that counsel had a close relationship with the children. On cross-examination, she agreed that she objected to the way the petitioner was bringing up the children. She objected to the public school education, and felt that all the court studies and evaluations placed undue positive reliance on the white neighborhood in which the petitioner lived. As a Puerto Rican, she felt that her residence in Hartford was looked down upon by the institutions making decisions about the children's well-being.
The respondent denied telling a probate court judge that she was fit to work and take care of the youngest child. She reaffirmed that she was working to her maximum, in light of her recovery efforts, and her work with the church. She agreed that she was not compensated for her volunteer work at her church, and that she received only minimum wage for the limited work that she did.
She testified that she went to Puerto Rico once per year to see her parents, and that there were occasions when her parents would pay for her airfare. Counsel argues that her priorities are not aligned to her children first. Based upon the questions of Assistant Attorney General Dunn, the respondent testified that she did like working twenty (20) hours per week. She denied that she was capable of working full time only CT Page 9663 when she was seeking custody of her children, and denied that she was limiting her work life because she no longer was seeking custody of her youngest child.
The petitioner testified. She resides in Newington, Connecticut. She claims that she has spent over Fifty Thousand ($50,000.00) Dollars on the litigation concerning the guardianship and visitation of the three children of the respondent. In 1991, she claimed that Ms. Vargas had very few visits with the children, and that she spent her time visiting a friend in jail. Prior to the release from Youth Challenge, the petitioner's home was investigated so as to allow the respondent to visit with her children in the petitioner's home. Thereafter, Youth Challenge allowed approximately three visits. In August and September of 1991, she had alternating weekend visits during the day. Those visits happened consistently until the end of the year. The petitioner testified that she stopped visits, because the youngest child came home before Christmas very upset from a visit with mom. In 1992, the petitioner transported the children, and they spent most of their time (up to five hours weekly) in the respondent's home.
In 1993, the children visited, but problems developed when respondent did not show up for visits, or canceled at the last minute. Those problems continued into 1994, when the oldest child moved away to Ohio, and the petitioner feared that the youngest child might be removed from Connecticut involuntarily. The witness agreed that she withheld contact between the children and mother, so that the problems she saw from the children could be dealt with by the court before visitation resumed. The two older children left the petitioner's home, and thereafter the second child dropped out of school. She had been an honor student. The oldest two now have no contact with the petitioner. She testified that she always allowed the children to articulate where they wanted to live, and when the second child, Neomi, asked to live with her mother, it was allowed.
Petitioner denied that she had interfered with the relationship between the children and their mother. She claimed that the problems with visitation were occasioned by the mind games which mom played with her own children. She testified that she had never intercepted mail from the mom to the children, and that the respondent never had a telephone which would allow the children to be in touch with the mother.
The petitioner claimed that the respondent told Probate Judge Gaffney that she preferred to work only part-time, and that she wanted to be able to help her church by volunteering.
The respondent was called in brief rebuttal concerning missed visits. CT Page 9664 She claimed that missed visits were rare, and that the children expressed desire to be with her when they were supposed to have been returned to the petitioner's home. She agreed that she was in a prison visitation program through her church, and attended that with some frequency. She claimed that it did not interfere with her time with the children. She did visit Puerto Rico because her parents and family are there. The only members of her immediate family in Connecticut were her children.
The petitioner claims that any deviation from the Uniform Support Guidelines should not be any more than fifteen (15%) percent, and that the case should not "swallow the rule" so as to eviscerate the statute.
The respondent claims that the Supreme Count has directed the inquiry of this court with respect to deviation criteria, and that the reference to the fifteen (15%) percent deviation on a modification of child support is not relevant to the directive of the Supreme Court in its remand. It is assumed that a reasonable rent be the basis of the deviation, and respondent has elicited testimony concerning that. Her maintenance of the apartment was essential to her establishing consistent visits with her children. She asks the court to allow a deviation criteria which permits her to maintain a residence which her children can consider a "home" to visit their mother in. The respondent argues that when there was an order of child support, she paid that amount, and has been compliant with any order.
The petitioner argues that it would be inappropriate for this court to use the entire cost of her apartment rental as a reduction amount. The petitioner directs this court's attention to the grounds upon which two earlier judges were reversed with respect to the calculations of deviation criteria.
The parties have stipulated that the correct guidelines amounts of child support are, and the court so finds; 1)from May — August, 1991, $117.00 per week; 2) from September — December, 1991, $83.00 per week; 3) calendar year 1992, $76.00 per week; 4) first four weeks of 1993, $56.00 per week, 5) for the remaining 48 weeks the amount of $85.00 per week; 6) January — May, 1994 $117.00 per week, and June — December, 1994, $90.00 per week; 7) January — February 15, 1995, $164.00 per week; 8) February 15 — May, 1995, $82.00 per week; at which time respondent's job ended; 9) October — December 1995 (11 weeks), $40.00 per week. The petitioner withdrew any claim for arrearages due in 1988 and 1989, and the parties agreed that there were no sums due until May of 1991.
The gravamen of the continuing conflict of the parties is to what extent should the court deviate from the Uniform Support Guidelines. The CT Page 9665 credible evidence is that the respondent was at a substantial disadvantage due to her substance abuse, and her original decision to trust the petitioner to care for her children. While the two older children have had the temporary care of the petitioner, and this court makes no findings with respect to the quality of that care, the children have lived with petitioner, respondent, been in DCF custody in foster care, and have lived with other relatives or boyfriends. Certainly, the petitioner is not the cause of their lack of stability. The youngest child has been in the petitioner's care most consistently of all three children. The conflict concerning their care has not assisted in their finding stability. It appears to the court that the lack of stability continues for them into their majority, and into their independent life choices.
The evidence is credible that the respondent's motivation for sobriety is real, even though she has suffered relapses. The evidence is credible and the court finds that her periods of employment were assisted by her work with Youth Challenge, and her spiritual connection to that group. The evidence is credible that her desire to prove to the court that she was a parent worthy of spending time with her children necessitated her maintaining a competent home within which she could parent the children. The evidence is credible that she did visit the children during the periods stated, and only did so because she had a place to bring them. The court finds the issue for the respondent that the reasonable rental expense is a deviation criteria under 3(C), now 6(C). The effort which the respondent had to make to have minimum contact with her children lead the court to utilize the "other equitable criteria" available as permissible deviation criteria.
The court finds that the fixed expenses listed by the respondent in her brief are appropriate and reasonable as they pertain to the maintenance of her apartment. The court finds that those allowable deviation expenses are for rent and utilities, and total $123.00 per week. The court further finds that the "weekly visitation expenses" have been proven on this record. The respondent was credible in the claim of consistent payment of expenses for activities with the children. The interest in the court of acknowledging a deviation criteria, and setting awards of child support for the parties will hopefully allow the parties to conclude these issues, and begin the process of payment on those arrearages, which will not be paid in full for many years to come. Certainly, the payment on the arrearages will continue well into the adulthood of the respondent's children.
The respondent did testify that she spent most visits with the children at her home, or engaging in cultural or special events for which there was no charge. The involvement of members of her spiritual group CT Page 9666 minimized those expenses directly related to visits, as opposed to the more significant expenses of providing a competent home within which to visit the children. The court finds that it would be inappropriate to include in items of "fixed expenses" any general cost for food for the respondent, her transportation costs, or cost for her laundry. The court does find however, that her costs for visitation are minimally stated and significant within the context of this case, so as to be a deviation criteria. The significant visitation expenses were required in light of the competition for affection which was the undercurrent of all the litigation in this matter. It cannot but be inferred that the three children were aware of their mother's shortcomings, her need to defend her behavior and her mothering in court based upon the claims of the petitioner, and the continuing "siege mentality" of both parties who were simultaneously attempting to parent these children.
Insofar as the court has found certain fixed expenses and visitation expenses to be deviation criteria for the purposes of setting a child support amount, the court orders child support in the amount of $70.00 per week for twenty weeks (5-8/91) and $45.00 for sixteen weeks (8-12/91) in calendar year 1991, $40.00 per week in calendar year 1992, $35.00 for four weeks and $45.00 for forty-eight weeks in calendar year 1993, and $70.00 per week for twenty-two weeks (1/5/94) and $50.00 per week for thirty weeks (6-12/94) in 1994. The court orders that child support be paid at the rate of $164.00 per week from January 1, 1995 through February 15, 1995 (7 weeks), in the amount of $82.00 per week from February 15, 1996 through May, 1995 (11 weeks), and $40.00 per week from October, 1996 to the end of the year (11 weeks). The court finds that the respondent had no income subject to an order of child support in 1997 and 1998. The respondent agrees with the petitioner's claim that there is an arrearage for 1996 in the amount of $420.00.
The court finds arrearages due and owing the petitioner as follows: for 1991, $2,120.00; for 1992, $2,080.00, for 1993, $2,300.00, for 1994, $3,040.00, for 1995, $2,490.00, and for 1996, $420.00. The total is $12,450.00. The total shall be subject to any credits for payments on this arrearage, claimed by the respondent to be $3,060.00.
The court orders that the respondent file a financial affidavit and guidelines worksheet with respect to current orders on this arrearage, unless such orders have already been entered with respect to her current ability to pay current support and a payment on the arrearage yet to be determined.
The court ratifies and orders the stipulation of the respondent and the State of Connecticut that the arrearage is $3,870.00 to the State of Connecticut which amount shall be paid pursuant to the guidelines. CT Page 9667